UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MARY E. BAILEY,

                                Plaintiff,

v.                                                                        1:16-CV-1370
                                                                          (GTS/CFH)
TIM F. SHEEHAN,

                                Defendant.
_____

APPEARANCES:                                            OF COUNSEL:

SUSSMAN & WATKINS                              MICHAEL H. SUSSMAN, ESQ.
  Counsel for Plaintiff                                 JONATHAN R. GOLDMAN, ESQ.
1 Railroad Avenue, Suite 3
P.O. Box 1005
Goshen, NY 10924

HINMAN STRAUB, P.C.                             BENJAMIN M. WILKINSON, ESQ.
  Counsel for Defendant                            JOSEPH M. DOUGHERTY, ESQ.
121 State Street                                         KRISTIN FOUST, ESQ.
Albany, NY 12207

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

Currently before the Court, in this employment civil rights claim filed by Mary E. Bailey

("Plaintiff") against Tim F. Sheehan ("Defendant"), is Defendant's motion for summary

judgment.  (Dkt. No. 54.)  For the reasons set forth below, Defendant's motion for summary

judgment is granted in part and denied in part.

## I.      RELEVANT BACKGROUND

### A.      Plaintiff's Complaint

Generally, in her Complaint, Plaintiff asserts two claims.  (Dkt. No. 1 [Pl.'s Compl.].)

First, Plaintiff claims that Defendant engaged in sexual harassment through creating a hostile work environment based on her sex in violation of the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983.  (*Id.* at ¶ 39.)  More specifically, Plaintiff alleges that Defendant engaged in the following conduct: (a) Defendant treated Plaintiff differently than male employees of the same rank and station; (b) Defendant "asked her to spend the night with him at the hotel" during a retirement party for a fellow employee; (c) Defendant advised her to get a Mustang or Camero because it would help her "get laid"; (d) Defendant referred to her current car as an "old lady's car"; and (e) Defendant advised her to let out her "dominatrix side" to stand up to staff that were not following her directions.  (*Id.* at ¶¶ 11, 13, 16-17, 21.)

Second, Plaintiff claims that Defendant engaged in *quid pro quo* sexual harassment against her for rebuffing his sexual advances in violation of the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983.  (*Id.* at ¶ 40.)[1]

### B.    Undisputed Material Facts on Defendant's Motion for Summary Judgment

Unless otherwise noted, the following facts were asserted and supported with accurate record citations by Defendant in his Statement of Material Facts and expressly admitted by Plaintiff in her response thereto or denied without appropriate citation.  (*Compare* Dkt. No. 54, Attach. 8 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 58, Attach. 13 [Pl.'s Rule 7.1 Resp.].)

1.    Defendant, as of February 2019, is a 64 year-old male.

---

[1]    Plaintiff states in her opposition memorandum of law that she voluntarily withdraws this claim for *quid pro quo* sexual harassment.  (Dkt. No. 58, at 5 n.1 [Pl.'s Opp'n Mem. of Law].)  The Court finds that Plaintiff's Second Claim is hereby dismissed with prejudice pursuant to Fed. R. Civ. P. 41(a)(2).  The Court notes that, in the alternative, Plaintiff's Second Claim is dismissed for the reasons stated in Defendant's memorandum of law, and that only her First Claim for hostile work environment sexual harassment remains at issue in this motion.

2.      Plaintiff, as of February 2019, is a 61 year-old female.

3.      Defendant graduated from Catholic Central High School in 1973, received an Associate's Degree in Police Science from Hudson Valley Community College in 1975, and received a Bachelor's of Science from the Regents College of the University of the State of New York in 1992.

4.      Defendant began his career at the New York State Department of Corrections and Community Supervision ("DOCCS") in 1983.

5.      Defendant worked continuously for DOCCS until he retired on October 14, 2016.

6.      When Defendant retired from DOCCS in October of 2016, he was the Superintendent of Washington Correctional Facility ("WCF").

7.      Defendant held the position of Superintendent at WCF from 2012 until his retirement in October of 2016.

8.      Before becoming the Superintendent at WCF, Defendant was the Superintendent at Moriah Correctional Facility ("Moriah") from 2007 until 2012.

9.      Plaintiff was the Deputy Superintendent of Program Services ("DSP") at WCF from February 10, 2010, until her retirement in November of 2017.

10.      Plaintiff retired after being demoted by DOCCS on November 9, 2017, from DSP to Supervising Offender Rehabilitation Coordinator ("SORC") following DOCCS' determination that she had violated the DOCCS Employee Manual and Directives.

11.      Plaintiff concedes that she is not seeking to hold Defendant responsible for her demotion on November 9, 2017.

12.      Defendant did not know Plaintiff prior to becoming the Superintendent at WCF.

13.     As the Superintendent at WCF, Defendant was responsible for overseeing the entire WCF facility and staff and was also responsible for leading the Executive Team.

14.     The Executive Team at WCF consisted of the Superintendent, the Deputy Superintendent of Security ("DSS"), the Deputy Superintendent of Administration ("DSA"), the DSP, the Plant Superintendent, the Captain of Security, and the Steward.

15.     The Executive Team met on a weekly basis to review directives from DOCCS' Central Office, issues at the facility, and upcoming events.

16.     Always present at the weekly meetings were the Superintendent, the DSS, the DSA, the DSP, the Plant Superintendent, the Steward, and the Superintendent's secretary, or a representative on their behalf.

17.     From 2012 until October 2016, the DSS was Gary Constant initially, followed by Steve Rowe.

18.     From 2012 until October 2016, the DSA was David Casterline initially, followed by Bob Raymond, and then Mark Walker.

19.     From 2012 until October 2016, the members of the Executive Team were all males, with the exception of Plaintiff and Ann Fiorini, the Steward.

20.     From 2012 until October 2016, Defendant's secretary was Joyce Corcoran initially, followed by Melissa Knipes in September 2012.

21.     As the DSP at WCF, Plaintiff was responsible for the academic, vocational, recreational, guidance and counseling areas, as well as chaplain and volunteer services.

22.     The Superintendent conducted the Executive Team meetings in a round table format and asked each member of the Executive Team to provide an update on relevant matters

or upcoming events in their area.

23.     When asked by Defendant to provide an update on her area, Plaintiff would sometimes be unprepared and tell Defendant that she did not have the relevant information.

24.     Defendant told Plaintiff to have the information available for the next meeting.

25.     In response to Plaintiff's statement of unpreparedness, Defendant would, among other things, tell her that they would discuss the matter after the meeting.

26.     Plaintiff was sometimes unprepared at the Executive Team meetings, and (from the Executive Team's perspective) appeared to have difficulty in following through with directives.

27.     From the Executive Team's perspective, Plaintiff appeared to never entirely correct her occasional unpreparedness at the Executive Team meetings.

28.     As the DSP at WCF, Plaintiff was also responsible for coordinating the special events held for inmates at WCF. Specifically, Plaintiff was required to draft special events packets for each event that included the details required to operate the event.

30.     The special events packets included, among other things, the appropriate number of staff and civilians to work the event, the timing and location of the event, and the food to be served at the event.

31.     Several other departments within WCF, such as security and food service, relied on the information set forth in the event packets to execute each event.

32.     It is DOCCS protocol for the DSP to conduct a special events meeting forty-five days before the event and to complete and submit purchase requests for food thirty days before the event.

33.     It was also Defendant's policy while Superintendent of WCF to finalize and distribute the special events packets to WCF staff approximately two weeks before the event to allow adequate time to prepare.

34.     From September of 2012 until approximately spring of 2014, Melissa Knipes, Defendant's secretary, often assisted Plaintiff with the organization and finalization of the special events packets, and frequently had to remind Plaintiff of impending deadlines, missing paperwork, and required staff approvals for the special events packets.

35.     Plaintiff was sometimes not organized with the special events packets and sometimes struggled to complete the packets in a timely manner.

36.     Defendant conferred with Plaintiff on numerous occasions regarding her occasional tardiness with the special events packets, but, from the Executive Team's perspective, she never fully addressed her admitted weakness of turning in these event packets on time during Defendant's tenure as Superintendent at WCF.

37.     Plaintiff conceded that these special events packets were a weakness of hers and that she did not do the scheduling of events well.

38.     From February 2014 until June 2017, Captain of Security Ball spoke to Plaintiff regarding the special event packets and informed her that she provided the packets too late, potentially requiring the event to be cancelled.

39.     Plaintiff's inability to prepare the special events packets in a timely manner rendered Captain Ball unable to schedule unionized WCF staff in accordance with the collective bargaining agreement parameters.

40.     On several occasions, Secretary Knipes spoke with Plaintiff regarding the

6

necessity for timeliness and efficiency with preparation of the special events packets.

41.     During Secretary Knipes' conversations with Plaintiff, Plaintiff repeatedly indicated that she was aware that she did not complete the packets with enough advanced time.

42.     In March of 2015, Defendant attended the retirement party in honor of Robert Raymond, along with Plaintiff and other members of the Executive Team.

43.     Plaintiff and Defendant engaged in a conversation with others at Mr. Raymond's retirement party regarding Lucky Stevens, a retired DOCCS employee, which included a discussion of how Lucky Stevens and his wife were swingers and swapped romantic partners.

44.     After it was discussed that Lucky Stevens and his wife were swingers, Plaintiff said aloud to the group (which included Defendant), "I have an alter ego as a dominatrix."

45.     Defendant was dumbfounded by Plaintiff's comment and did not respond further or engage in additional conversation with Plaintiff regarding her statement that she was a dominatrix.

46.     Defendant stayed in a hotel the night of Mr. Raymond's retirement party.

47.     Defendant never disciplined Plaintiff after Mr. Raymond's retirement party in March of 2015.

48.     From March of 2015, after Mr. Raymond's retirement party, until October of 2016, when Defendant retired, Plaintiff never received a reduction in her compensation or regularly scheduled hours, and was never demoted or had her job duties altered in any way.

49.     Before Mr. Raymond's retirement party in March of 2015, Defendant often worked directly with staff in the recreation program and employees under Plaintiff's control with whom he was friendly.

7

50.     Defendant's practice of working directly with WCF staff with whom he was friendly in the recreation program continued after Mr. Raymond's retirement party.

51.     On several occasions, Defendant told Plaintiff to put her foot down and be firmer when addressing her subordinates, specifically with WCF employees Tamara Williams and Bill Aiken.

52.     On another occasion, Defendant told Plaintiff that he was impressed when she asserted herself to Ann Fiorini in an executive team meeting.

53.     From 2012 until October 2016, Plaintiff did not receive a negative evaluation from Defendant, but rather always received a satisfactory performance rating.

54.     In 2014 and 2015, DOCCS Deputy Commissioner Jeff McCoy sought to move Plaintiff from her position as DSP because of her ineffective job performance in overseeing the academic area after two negative audit reports from the Central Office.

55.     In both 2014 and 2015, Defendant defended Plaintiff and told Deputy Commissioner McCoy that it was not entirely Plaintiff's fault that the academic area was struggling.

56.     Defendant told Deputy Commissioner McCoy that he did not want to move Plaintiff since he was working with her on the problem areas and was "making headway" with her.

57.     Plaintiff remained in her position as the DSP at WCF even though Deputy Commissioner McCoy recommended that she be moved on two occasions.

58.     As a member of the Executive Team, Plaintiff was required to make rounds at WCF.

8

59.     Plaintiff had two vehicles–one vehicle that was a convertible and another that was a sedan.  On more than one occasion, Plaintiff discussed her vehicles in the workplace because they broke down and she needed to alert Defendant when dropping her cars off at the shop for repairs.

60.     Plaintiff informed Defendant on several occasions that she would be late coming into work because her vehicles needed to be repaired.

61.      Defendant recommended that Plaintiff get a Mustang or a Camero.

62.     Plaintiff stated that she did not want to get rid of her convertible because she enjoyed being noticed while driving it and she liked the feeling of wind blowing in her hair.

63.     On or about December 30, 2015, a conference call was held between Defendant, Plaintiff, Linda Holeman, the Director of Education, and Assistant Commissioner Cunningham, in which Assistant Commissioner Cunningham asked Plaintiff about her actions to fix certain deficiencies identified in a failed audit of one of her program areas.

64.     During the call of December 30, 2015, Plaintiff responded, "I think so" or "I guess so" when asked by Assistant Commissioner Cunningham if she had implemented a remedy.

65.     After the conference call, Defendant told Plaintiff that he was disappointed in the uncertain manner in which she had answered Assistant Commissioner Cunningham's questions, and that, as the DSP of WCF, she should be knowledgeable of all aspects of her program areas and be able to provide that information to a superior when requested.

66.     On at least one occasion, Plaintiff made comments in the workplace of a sexual nature, specifically a comment about how a coworker had two boyfriends and could "get laid" while she could not.

67.     In front of other WCF staff, Plaintiff stated, "Why can't I get laid?"

68.     In approximately the winter of 2015 or early 2016, Plaintiff asked Captain Ball if he was sleeping with another female WCF colleague, to which Captain Ball replied in the negative.

69.     Plaintiff concedes that the work environment at WCF was casual, that WCF staff often joked with one another, and that Plaintiff participated in the "facility banter."

70.     It was normal practice for Defendant to make rounds of the facility and to informally meet or speak with Plaintiff's program staff during those rounds.

71.     Defendant never changed tool control procedures without first advising Plaintiff.

72.     Defendant spoke to Plaintiff regarding her meeting with the night academic staff and the negative impression that her meetings were having on the day-time academic staff.

73.     On March 15, 2016, Plaintiff filed a complaint alleging sexual harassment in the workplace and hostile work environment against Defendant with the Office of Special Investigations ("OSI").

74.     The Office of Diversity Management ("ODM") joined in the investigation, and collectively OSI and ODM interviewed approximately thirty-four witnesses.

75.     Plaintiff provided a statement to ODM and OSI in connection with their joint investigation.

76.     In her statement to ODM and OSI, Plaintiff concedes that she is "no wilting flower" in that she does not offend easily and that it takes a lot for her to feel uncomfortable.

77.     Plaintiff also stated in her ODM statement that she was not performing up to par.

78.     After Plaintiff filed her complaint with OSI and ODM in March of 2016,

Defendant did not exclude Plaintiff from Executive Team meetings or deny Plaintiff an opportunity to report on her area of responsibility at the Executive Team meetings.

79.     After Plaintiff made her complaint against Defendant, Defendant never disciplined her, reduced her hours, modified her job duties, or reduced her compensation.

80.     Plaintiff left WCF for medical reasons from August 2016 until October 20, 2016, and began seeing psychologist Dr. Edmund Burke.

81.     On or about October 14, 2016, Defendant retired.

82.     Plaintiff was not prescribed any medication by Dr. Burke, but engaged in talk therapy.

83.     When Plaintiff returned to work on October 20, 2016, Defendant had already retired.

84.     Defendant never made fun of Plaintiff or laughed at her in the workplace.

85.     Defendant never screamed or yelled, or made fun of or laughed at, any of the male employees of WCF.

86.     Defendant never made fun of or laughed at any of the other female employees of WCF.

87.     Defendant did not treat any of the male employees of WCF in an uncivil manner in the workplace.

88.     Defendant did not treat Ann Fiorini, a female and member of the Executive Team, differently than Plaintiff or any of the male deputies on the Executive Team.

C.    **Parties' Briefing on Defendant's Motion for Summary Judgment**

1.    **Defendant's Memorandum of Law**

Generally, in his motion for summary judgment, Defendant makes four arguments. (Dkt.

No. 54 [Def.'s Mem. of Law].)  First, Defendant argues that all claims of wrongdoing that

occurred more than three years before the filing of Plaintiff's Complaint are time-barred.  (*Id.* at

4.)  Specifically, Defendant argues that the Court should dismiss Plaintiff's claims to the extent

that they arise from events occurring between when Defendant arrived at WCF in April 2012 and

November 17, 2013, when he "routinely treated Plaintiff in an uncivil manner, yelling at her in

front of both of her peers and subordinates and devaluing her work product" and "treated

Plaintiff in a manner dissimilar to the way in which he routinely treated males of the same rank

and station," because those portions of her claims fall outside of the three-year statute of

limitations and thus are time-barred.  (*Id.* at 4.)

Second, Defendant argues that Plaintiff's Section 1983 hostile work environment sexual

harassment claim is without merit.  (*Id.* at 5.)  More specifically, Defendant argues that Plaintiff

must demonstrate that (1) she was intentionally harassed, (2) the harassment was based on her

gender (3), such actions were taken under color of state law, and (4) the harassment was so

severe as to render the work environment hostile to her. (*Id.* at 5.)  Defendant argues that Plaintiff

has failed to demonstrate that these four conditions are met for the following reasons: (a) the

evidence shows that Defendant yelled at Plaintiff's male counterparts when their work

performance was poor in a similar manner to the way Defendant yelled at Plaintiff when her

work performance was poor, and appropriate supervision of employees whose performance is

poor and creating an equally harsh environment for both males and females does not constitute

intentional harassment; (b) based on the fact that Plaintiff's initial statement to ODM stated that she believed she was treated differently because of personality differences and Defendant's "napoleon complex" and that she later testified that she did not have any belief as to why Defendant allegedly treated her in a "belittling manner," Plaintiff has failed to plausibly allege that Defendant's alleged harassment was motivated by her gender; (c) the comments allegedly made by Defendant (even if accepted as true) occurred over the course of four years in a sporadic and episodic fashion; and (d) Plaintiff's admission that she discussed her own sex life with, and made inappropriate sexual comments to, other co-workers during work hours demonstrates that she was not subjectively offended by the Defendant's alleged conduct.  (*Id.* at 7-16).

Third, Defendant argues that Plaintiff's Section 1983 *quid pro quo* sexual harassment claim is without merit.  (*Id.* at 17.) Defendant argues that, to establish a prima facie case of *quid pro quo* sexual harassment, Plaintiff must "present evidence that she was subject to unwelcome sexual conduct, and that her reaction to that conduct was then used as the basis of decisions affecting the compensation, terms, conditions, or privileges of her employment."  (*Id.* at 18.) Defendant argues that, because Plaintiff does not allege that Defendant indicated to her that her employment would be affected in any manner if she did not agree to spend the night with him, and because she was not demoted, suspended, or otherwise disciplined at any time before Defendant's retirement, she has not plausibly alleged any retaliation or adverse employment action.  (*Id.* at 19-20.)  Defendant argues that his written evaluations of Plaintiff remained "satisfactory" before and after the 2015 retirement party when the alleged sexual proposition took place and she did not experience any reduction in her compensation while Defendant was her supervisor.  (*Id.* at 20.)  Defendant argues that Plaintiff's experience remained consistent

13

throughout her time at work regardless of her rejection of Defendant's alleged sexual advances, and that the only allegation that may support her claim is her allegation that Defendant unfairly scrutinized and criticized Plaintiff's work performance after the alleged proposition; however, she admits that this conduct occurred even before the alleged rejection of Defendant's sexual advances and, regardless, criticism of an employee or negative evaluations, in and of themselves, do not constitute adverse employment actions.  (*Id.* at 21-22.)  Defendant additionally argues that excessive scrutiny alone cannot constitute an adverse employment action without other negative consequences such as a decrease in pay or employment probation.  (*Id.* at 22.)

Finally, Defendant argues that Plaintiff's claims should be dismissed under the doctrine of qualified immunity because it was objectively reasonable for him to believe that his actions were lawful at the time and his conduct did not violate any clearly established Constitutional rights.  (*Id.* at 24.)

## 2.    Plaintiff's Opposition Memorandum of Law

Generally, in her opposition memorandum of law, Plaintiff makes three arguments.  (Dkt. No. 58 [Plaintiff's Opp'n Mem. of Law].)  First, Plaintiff argues that, despite the prohibition on challenges to discrete discriminatory acts occurring outside the limitations period, Title VII recognizes the continuing violation doctrine for claims based on a hostile work environment because such claims are composed of a series of acts that collectively constitute one unlawful employment practice and it does not matter that some of the component acts of the hostile work environment fall outside statutory time period.  (*Id.* at 16.)  Plaintiff argues that any conduct that she alleged from before November 17, 2013, can form the basis of her hostile work environment claim because those alleged actions helped to create one unlawful employment practice.  (*Id.*)

14

Second, Plaintiff argues that a reasonable jury could conclude from the record evidence that Defendant intentionally created a sexually hostile work environment for her.  (*Id.*)  Plaintiff argues that Defendant's conduct towards other women in the office (Jean Ehntholt, Constance Torres, and Erin Clark) is direct evidence of the type of conduct that created the hostile work environment which altered the condition of Plaintiff's employment for the worse, and that she need not be the target of other instances of hostility in order for those incidents to support her claim of a hostile work environment.  (*Id.* at 18.)  Plaintiff argues that a jury could find that this evidence contradicts Defendant's claim that Plaintiff's conditions of employment did not change as the result of his conduct.  (*Id.* at 19.)  Plaintiff also argues that Defendant's argument regarding her claim being based upon a "few isolated alleged incidents" fails to view the environment as a whole under the totality of the circumstances and improperly separates the instances of inappropriate conduct.  (*Id.*)  Plaintiff argues that a jury could find that Defendant's conduct was persistent over the years in a manner which infected the entire work environment and also affected several other female employees.  (*Id.* at 21.)  Plaintiff responds to Defendant's argument that he did not intentionally harass her by noting that many of the relevant facts remain disputed, precluding the Court from granting summary judgment.  (*Id.* at 22.)

Third, Plaintiff argues that a reasonable person in Defendant's position would have understood that he was violating clearly established law and, thus, Defendant is not entitled to qualified immunity.  (*Id.*)  Plaintiff argues that her right to be free from sexual harassment in the workplace was clearly established by the time of the alleged conduct and that a reasonable person would understand that making sexual advances to a subordinate, persistently making unwanted sexual comments to that same subordinate, and treating that subordinate abusively because of her

15

gender would violate the Constitution.  (*Id.*)  Plaintiff argues that, because this right was clearly established and a reasonable person who conducted themselves in the same manner would have known that they were violating this right, Defendant is not entitled to qualified immunity.  (*Id.* at 23-24.)

### 3.     Defendant's Reply Memorandum of Law

Generally, in his reply memorandum of law, Defendant makes five arguments.  (Dkt. No. 61 [Def.'s Reply Mem. of Law].)  First, Defendant argues that none of the alleged conduct, individually or collectively, rises to the level of being objectively severe or pervasive because it consists of episodic and isolated incidents that occurred over the period of three years that are not sufficiently severe to create a hostile work environment.  (*Id.*)

Second, Defendant argues, his criticism of Plaintiff's work performance was not actionable sexual harassment.  (*Id.*)  More specifically, Defendant argues as follows: (a) the criticism referred to by Plaintiff was regarding work-related deficiencies with her job performance; (b) Defendant's alleged comments were not directed at Plaintiff because of her gender; and (c) Plaintiff provided no sworn testimony from any witnesses supporting Defendant's alleged uncivil treatment of Plaintiff, while multiple members of the Executive Team provided sworn affidavits that refute Plaintiff's allegations.  (*Id.* at 3-5.)

Third, Defendant argues that generalized and sporadic sex talk does not create a hostile work environment.  (*Id.*)  More specifically, Defendant argues as follows: (a) because Plaintiff acknowledged that she was not a party to the discussions where sexual stories were allegedly discussed by Defendant and that these stories were sporadic over a period of four years, these stories did not create a sexualized hostile work environment; and (b) Defendant allegedly told

16

sexual stories in the lunch room or in Executive Team meetings in front of both male and female members, thus making the work environment equally "hostile" for both male and female employees.  (*Id.* at 7-9.)

Fourth, Defendant argues that facts not alleged in the Complaint should be disregarded. (*Id.*)  More specifically, Defendant argues as follows: (a) Plaintiff's Complaint fails to allege that Defendant's sexualized comments to other employees contributed to her hostile work environment claim; and (b) Plaintiff did not know about the other female workers allegations until after she filed suit and conducted discovery, making it impossible for those allegations to have affected Plaintiff's work experience.  (*Id.* at 9.)

Finally, Defendant argues that Secretary Melissa Knipes denied ever reporting to Plaintiff that Defendant made sexual advances toward Ms. Knipes, citing a sworn statement from Ms. Knipes in which she disputes Plaintiff's allegations as false. (*Id.* at 10.)

### 4.   Plaintiff's Sur-Reply

Generally, in her sur-reply, Plaintiff makes two arguments. (Dkt. No. 65 [Plaintiff's Sur-Reply].) First, Plaintiff argues that the Court may properly consider facts that were not alleged in the Complaint because she is not seeking to add a new claim to her original Complaint, but is merely using those facts to support her existing claim.  (*Id.*)  More specifically, Plaintiff argues that, although precedent might prevent her from adding a new claim at this late stage in the proceeding through the factual assertions in her memoranda of law, it does not bar her from relying on evidence supporting those factual assertions even though they was not set forth in her Complaint, because they are relevant to her pre-existing sexual harassment claim.  (*Id.*)  Plaintiff argues that the statements of Ms. Ehntholt, Ms. Torres, Ms. Clark, and Beth Dietz help show

how Defendant sexualized the workplace and thus created a hostile work environment for

Plaintiff.  (*Id.*)

Second, Plaintiff argues that, contrary to Defendant's argument that she was unaware of

these facts before she filed her Complaint, she was aware that Defendant "lingered in the

guidance department engaged in sexualized conversations that impacted certain employees."

(*Id.*)  In support of this argument, Plaintiff cites the fact that she previously asserted in her

declaration that she had been aware of Defendant regularly engaging in sexualized conversations

with other employees and that she had confronted Defendant about this alleged conduct by telling

him that it undermined her authority, particularly as to Andrea Baldwin.  (*Id.*)  In addition,

Plaintiff argues that Ms. Ehntholt testified at her deposition that she and others had made

Plaintiff aware of Defendant's alleged conduct during the relevant time period.  (*Id.*)  Thus,

Plaintiff argues that the argument that she was unaware of these allegations is false.  (*Id.* at 4-5.)

## II.   LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there

is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record] evidence is

such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986).[2]  As for the materiality requirement, a dispute of fact is

"material" if it "might affect the outcome of the suit under the governing law . . . . Factual

---

[2]        As a result, "[c]onclusory allegations, conjecture and speculation . . . are
insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir.
1998) [citation omitted].  As the Supreme Court has explained, "[The non-movant] must do more
than simply show that there is some metaphysical doubt as to the material facts." *Matsushita
Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).[3]

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.[4] Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What

---

[3]     Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

[4]     *Cusamano v. Sobek*, 604 F. Supp.2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.[5]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[6]  Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden.  *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at

---

[5]        Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 7.1(a)(3).

[6]        *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

*2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

III.   **ANALYSIS**

A.   **Whether the Court May Consider Plaintiff's Facts Not Alleged in the Complaint**

After careful consideration, the Court answers the above question in the affirmative for the reasons stated in Plaintiff's sur-reply.  (Dkt. No. 65, at 4-7 [Pl.'s Sur-Reply].)  To those reasons, the Court adds the following analysis.

The Court rejects Defendant's argument that Plaintiff's reliance on facts other than those alleged in her Complaint results in an impermissible de facto attempt to amend her Complaint. The relevant case law (including cases cited by Defendant) supports the common-sense point of law that new allegations presented in opposition to a motion for summary judgment cannot be considered if those allegations support new *claims*.  *See Simpson v. Town of Warwick Police Dept*, 159 F. Supp. 3d 419, 440 (S.D.N.Y. 2016) (collecting cases); *Ribis v. Mike Barnard Chevrolet-Cadillac, Inc.*, 468 F. Supp. 2d 489, 495-97 (W.D.N.Y. 2007) (noting that, in civil actions, "a plaintiff may not use a memorandum of law or similar paper to assert a claim that is not contained in the complaint," and finding that plaintiff's newly asserted factual allegations should not be considered "to the extent that plaintiff is now attempting to assert a claim that she was retaliated against by losing her job offer" because such claim was not asserted in her complaint or reasonably related to the hostile work environment claim asserted in her complaint); *Petrisch v. HSBC Bank USA, Inc.*, 07-CV-3303, 2013 WL 1316712, at *11 (E.D.N.Y. Mar. 28, 2013) (finding that consideration of newly asserted factual allegations in opposition to a motion for summary judgment would be unjust because defendants had not had an opportunity to conduct discovery on those allegations, and in particular were denied the opportunity to ask

21

questions at plaintiff's deposition where she failed to raise those issues); *Anderson v. Aset Corp.*, 329 F. Supp. 2d 380, 383 (W.D.N.Y. 2004) (rejecting an attempt to essentially amend the complaint by making arguments that the claim asserted in the complaint was meant to be a different claim).

However, here, Plaintiff presented evidence of facts regarding Defendant's conduct with other female employees, including her own subordinates, which she argues helps show that Defendant created a sexualized workplace through telling inappropriate sexual stories and jokes that made multiple female employees uncomfortable.  Unlike the allegations in the cases discussed above, these facts do not support a new claim, but merely have a "tendency to make [the hostile work environment she allegedly experienced] more . . . probable than it would be without the evidence" for the purposes of Fed. R. Evid. 401.  The Court notes that, whether or not Plaintiff had discussed these new facts in her opposition memorandum of law, the Court would have been permitted to consider evidence of them on the pending motion for summary judgment.  The Court notes also that this evidence was previously either in Defendant's possession or accessible to him during discovery.  (Dkt. No. 65, at 4-7 [Pl.'s Sur-Reply].)  The Court therefore finds that it may consider these facts when determining whether Plaintiff has created a genuine dispute of material fact as to the existence of a hostile work environment.

**B.     Whether Certain Alleged Acts Are Time-Barred and May Not Be Considered**

After careful consideration, the Court answers the above question in the negative for the reasons stated in Plaintiff's opposition memorandum of law.  (Dkt. No. 58, at 19-21 [Pl.'s Opp'n Mem. of Law].)  To those reasons, the Court adds the following analysis.

In *Nat'l R.R. Passenger Corp. v. Morgan*, the Supreme Court stated that "[a] hostile work

22

environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice,' . . . [and] [t]he timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for the purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period.  Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116-17 (2002).

The Supreme Court did not, however, assess whether such principles also applied to hostile work environment claims brought under other statutes, in particular 42 U.S.C. § 1983, the statute on which Plaintiff has based her claim.  However, "[t]he law relating to continuing violations under Title VII has traditionally been held to apply by analogy to Section 1983 claims," *Drees v. Cnty of Suffolk*, 06-CV-3298, 2007 WL 1875623, at *18 (E.D.N.Y. June 27, 2007) (collecting cases), and courts have applied *Morgan* in particular to hostile work environment claims under Section 1983.  *Isbell v. New York*, 316 F. Supp. 3d 571, 586-87 (S.D.N.Y. 2018); *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 582 (S.D.N.Y. 2011); *Davis v. City of New York*, 09-CV-0669, 2010 WL 3895578, at *2 (S.D.N.Y. Oct. 5, 2010); *Bartoli v. City of New York*, 09-CV-4163, 2010 WL 1539055, at *3 (E.D.N.Y. Apr. 19, 2010); *Spector v. Bd. of Tr. of Cmty.-Tech. Coll.*, 06-CV-0129, 2007 WL 4800726, at *12 (D. Conn. Dec. 27, 2007), *aff'd*, 316 F. App'x 18 (2d Cir. Mar. 18, 2009); *Drees*, 2007 WL 1875623, at *18; *cf. Shomo v. City of New York*, 579 F.3d 176 (2d Cir. 2009) (relying on *Morgan* to apply continuing violation doctrine to deliberate indifference claims brought under Section 1983).

Consequently, because a claim for hostile work environment by its very nature is a series of acts that constitutes a single unlawful employment practice and Plaintiff has alleged that at least one act contributing to her claim occurred within the statutory period, all of Plaintiff's alleged acts may be considered as part of a continuing violation when deciding this motion, including those that otherwise would fall outside the three-year statute of limitations applicable to claims under 42 U.S.C. § 1983.

### C.     Whether Plaintiff Has Created a Genuine Dispute of Material Fact Regarding Her Hostile Work Environment Claim

After careful consideration, the Court answers the above question in the affirmative for the reasons stated in Plaintiff's memoranda of law.  (Dkt. No. 58 [Pl.'s Opp'n Mem. of Law]; Dkt. No. 65 [Pl.'s Sur-Reply].)  To those reasons, the Court adds the following analysis.

Claims for hostile work environment under 42 U.S.C. § 1983 are evaluated under the same framework as such claims under Title VII.  *Raspardo v. Carlone*, 770 F.3d 97, 113-14 (2d Cir. 2014).  To establish a hostile work environment claim, "a plaintiff must show that the 'workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Raspardo*, 770 F.3d at 114 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 [1993]).  "[T]he conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive," and "must be more than episodic [but rather] they must be sufficiently continuous and concerted in order to be deemed pervasive."  *Raspardo*, 770 F.3d at 114.  In assessing whether the incidents are sufficiently severe or pervasive to alter the conditions

of the plaintiff's work environment, "courts must assess the totality of the circumstances,

considering elements such as 'the frequency of the discriminatory conduct; its severity; whether

it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance.'" *Raspardo*, 770 F.3d at 114

(quoting *Harris*, 510 U.S. at 23).  Additionally, "it is axiomatic that mistreatment at work,

whether through subjection to a hostile environment or through other means, is actionable . . .

only when it occurs because of an employee's protected characteristic, such as race or gender."

*Isbell v. City of New York*, 316 F. Supp. 3d 571, 591 (S.D.N.Y. 2018); *see Gonzalez v. City of

New York*, 377 F. Supp. 3d 273, 297 (S.D.N.Y. 2019) (dismissing hostile work environment

claims under Section 1983 premised on age and race for failure to allege that the conduct was

because of either of those characteristics); *Harder v. New York*, 117 F. Supp. 3d 157, 165

(N.D.N.Y. 2015) (Hurd, J.) (noting that the "protected class" limitation applies to Title VII

claims brought under a theory of hostile work environment).

There remain a number of relevant factual disputes in this case as to what conduct

Defendant actually engaged in, including whether Defendant yelled at Plaintiff and treated her

differently from male employees (particularly in meetings with the Executive Team), whether

Defendant propositioned Plaintiff for sex, whether he made comments suggesting she let out her

"dominatrix side" at work, whether he made comments about her car indicating that a flashier car

would help her have more sex, whether he made comments pertaining to getting erections as a

result of her conduct, and whether he told sexually explicit jokes and stories in the workplace.

There are also factual disputes as to what extent Plaintiff herself engaged in sexually

inappropriate behavior in the workplace.  Given that these facts comprise most of the acts that

Plaintiff alleges contributed to the hostile, sexualized work environment, the Court cannot find as

a matter of law that there was not a sufficiently severe and pervasive pattern of conduct to establish the existence of a hostile work environment.

Similarly, these disputed factual issues create a genuine dispute of material fact as to whether Defendant's alleged conduct was because of her gender. The Court notes that the only acts that Plaintiff explicitly alleged were attributable to gender in her Complaint are (1) that Defendant treated Plaintiff in an uncivil manner by yelling at her and devaluing her work product in front of other employees, something that he did not do to males of similar rank and station, and (2) that Defendant isolated her at weekly team meetings by calling on and listening to male deputies, but ignoring Plaintiff and overruling her decisions. (Dkt. No. 1, at ¶¶ 10-11, 27 [Pl.'s Compl.].) The Court notes as an initial matter that Plaintiff has not pointed to any evidence establishing that Defendant ever made statements in gender-based terms to explain his alleged treatment of her, nor has she provided any other direct evidence substantiating that the alleged treatment was because of her gender. In her deposition, in response to questions about numerous incidents, including instances when Defendant allegedly yelled at her or treated her uncivilly, Plaintiff testified that she either did not believe or did not know whether Defendant's conduct was motivated by her gender. (Dkt. No. 54, Attach. 11, at 46, 50, 56, 73, 83, 87 [Pl.'s Dep.].) Ms. Ehntholt testified at her deposition that, from her experience, Defendant generally treated female employees worse than male employees, particularly in not taking their concerns seriously, yet Ms. Torres testified that she did not believe there was a difference in the way Defendant treated male and female staff. (Dkt. No. 58, Attach. 2, at 50-54, 58 [Ehntholt Dep.]; Dkt. No. 58, Attach. 3, at 39-40 [Torres Dep.].) It is also undisputed that Plaintiff had some difficulties performing her work to the expected standards, although the extent of the deficiency of her

26

performance is disputed.

Although there is potential merit in Plaintiff's allegation that Defendant did not yell at the other members of the Executive Team (all of whom were male with the exception of Ms. Fiorini) with the exception of one or two incidents, Plaintiff has not pointed to any evidence establishing that any of these male coworkers had similar performance issues to the ones that are demonstrated related to her work performance.  Without any indication that those male coworkers were in similar situations meriting similar discipline or reaction from Defendant, the Court cannot say that the mere fact that Plaintiff was the only individual yelled at or otherwise treated in the alleged manner by itself permits a reasonable factfinder to determine that she was treated thusly because of her gender.  *See Rector v. United States Dept of Justice*, 14-CV-1883, 2016 WL 7188135, at *8-9 (S.D.N.Y. Nov. 22, 2016) (noting that slights, offensive utterances, and uncivil treatment do not create a hostile work environment, particularly in the context where such conduct was not linked to a protected characteristic); *Hunt v. Arthur Kill Corr. Facility*, 11-CV-2432, 2012 WL 7658364, at *5 (E.D.N.Y. Oct. 9, 2012) (noting that "[a]n environment that would be equally harsh for all workers, or that arises from personal animosity, is not actionable under the civil rights statutes," and that "[m]ere allegations of hostility by themselves are insufficient to support a hostile work environment claim" without any facts linking the hostility to her gender or sex).

Additionally, as Defendant argues, Plaintiff's reliance on conversations between Defendant and other employees including sexually explicit stories and jokes does not suggest conduct based on Plaintiff's gender because those comments were made in mixed-gender groups (sometimes by female employees), were not inherently degrading to females, and were not

directed at her.  (Dkt. No. 54, Attach. 11, at 162-68, 170-73 [Pl.'s Dep.].)  In particular, the Court

notes that many of the sexually explicit comments, jokes, and conversations that Plaintiff relies

on occurred (a) outside of her presence and (b) in conversations with groups that included one or

more female subordinates, with those female subordinates either initiating or voluntarily

responding to sexually explicit remarks.  Nor were these conversations about Plaintiff or her

sexual life in particular.  The mere fact that a workplace might include conversations including a

sexual component does not make the workplace hostile, particularly where, as here, there is no

evidence to establish that the comments were specifically demeaning of a certain gender, but

rather simply generalized "sex talk."  *Sardina v. United Parcel Service*, 254 F. App'x 108, 110

(2d Cir. 2007) (finding that off-color comments about "office bitches" and "Brooklyn bimbettes"

together with sexually suggestive comments during the telling of sexual jokes did not create an

objectively hostile work environment); *Westry v. Stamford Pub. Schs.*, 06-CV-0022, 2008 WL

724955, at *4 (D. Conn. Mar. 14, 2008) (finding that sex-based conditions including staff

members telling sexual jokes and engaging in sexual conversations were not sufficient to

establish a hostile work environment because they were not even directed at the plaintiff).

Plaintiff also admits that there were instances when she contributed to the sexualized nature of

the conversations, including making a joke that her alter ego was a dominatrix at a retirement

party and lamenting that she could not "get laid" during a conversation about another employee's

sexual life.  (Dkt. No. 54, Attach. 11, at 168 [Pl.'s Dep.].)

      However, despite the above, Plaintiff's evidence related to Defendant propositioning her

for sex, his telling her she should bring out her dominatrix side (which is, by its nature, a term

applied typically to females), and his comments to her about how a flashier car would improve

her sex life including a story about how he once saw an attractive woman surrounded by men due to her proximity to a similar flashy car are all more directly related to her gender.  Such a finding would be sufficient to meet the "because of gender" component of a hostile-work-environment claim even if other alleged conduct is not overtly sexual or gender-based, and all conduct (whether overtly sexual or not) may be considered when assessing Plaintiff's claim.  *See Alfano v. Costello*, 294 F.3d 365, 375 (2d Cir. 2002) (rejecting the argument that a sex-based hostile work environment claim can be supported only by overtly sexual incidents, noting that "[t]here is little question that incidents that are facially sex-neutral may sometimes be used to establish a course of sex-based discrimination–for example, where the same individual is accused of multiple acts of harassment, some overtly sexual and some not").  Consequently, not withstanding the fact that the other conduct discussed above is not overtly based on Plaintiff's gender, Plaintiff has nonetheless sufficiently created a genuine dispute of material fact as to whether other conduct was based on her gender.

Based on the above, the Court denies Defendant's motion as to Plaintiff's claim for hostile work environment sexual harassment.

### D.    Whether Defendant Is Protected from Liability as a Matter of Law by the Doctrine of Qualified Immunity

Because the Court has already determined that there are genuine disputes of material fact as to whether Defendant violated Plaintiff's rights under the Equal Protection Clause, the Court cannot conclude that Defendant is entitled to qualified immunity at this stage.  The Court notes that, based on the evidence, Defendant is not entitled to qualified immunity because Plaintiff's evidence in support of Defendant's alleged propositions for sex the night of the retirement party

29

in conjunction with the alleged comments discussed above, if taken as true, would suggest conduct that no objectively reasonable official would believe fell outside the bounds of inappropriate sexual harassment.  *See Raspardo*, 770 F.3d at 119-20 (denying qualified immunity based on a finding that the evidence, if true, demonstrated that the defendant violated the plaintiff's right to equal protection based on alleged incidents of unwanted touching, vulgar comments in front of coworkers, and more than ten comments about plaintiff's body over a period of one year).

The Court notes also that it is well-documented in this Circuit that a plaintiff's right to be free from severe or pervasive sexual harassment was clearly established by the time period in which the conduct at issue in this case occurred.  *See Raspardo*, 770 F.3d at 119-20 (collecting cases).  Where a right is clearly established at the time conduct occurs, qualified immunity is not warranted.  *Id.* at 113.

For all of these reasons, the Court declines to dismiss Plaintiff's First Claim based on the doctrine of qualified immunity.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 54) is **GRANTED** **in part** and **DENIED** **in part**; and it is further

**ORDERED** that Plaintiff's Second Claim for *quid pro quo* sexual harassment is **DISMISSED** **with prejudice**; and it is further

**ORDERED** that Plaintiff's First Claim for hostile work environment sexual harassment **SURVIVES** Defendant's motion; and it is further

**ORDERED** that counsel are directed to appear on **October 10, 2019 at 10:30 AM** in

Syracuse, NY, in chambers for a pretrial conference, at which time counsel are directed to appear

with settlement authority, and in the event that the case does not settle, trial will be scheduled at

that time.  Plaintiff is further directed to forward a written settlement demand to Defendant no

later than **September 13, 2019**, and the parties are directed to engage in meaningful settlement

negotiations before the conference.  In the event that counsel feel settlement is unlikely, counsel

may request to participate via telephone conference for the limited purpose of scheduling a trial

date by electronically filing a letter request at least one week before the scheduled conference.

Dated: August 22, 2019
       Syracuse, NY

Hon. Glenn T. Suddaby
Chief U.S. District Judge